26-1641. Attorney Glasser, you have reserved three minutes of time for rebuttal, correct? That's correct, Your Honor. Okay, you may proceed. Thank you, Your Honors. Good morning, and may it please the Court. I'll focus primarily on two independent grounds for reversal. First, the District Court's post-trial construction requiring a temperature alteration, and second, the District Court's failure to address key Doctrine of Equivalence theories as well as evidence. So starting first with the issue of claim construction. The claim limitation at issue here is, quote, having a pH of 13 or higher. And that's specifically addressed to the composition of the bulk solution during the manufacturing process. Well, that last phrase, it seems to me, is not implicit in having, that is, during the manufacturing process. Suppose you have a manufacturing process that took a number of hours and then it sat for seven hours, and then you start the freeze-dry. So I would have thought that the natural meaning of formed-from-a-bulk-solution-having is having at the time that you're doing the forming, namely the freeze-dry, which need not be the manufacturing time. So a couple of responses to that, Your Honor. On the facts of this case, the ANDA does include a situation where it's freeze-dried immediately from being— I'm just—you assumed that the claim language—now we're just talking about claim construction— referred to the manufacturing process, and I guess I want to press back on that. Sure. To take a step back, Your Honor, my point really was this is all occurring as part of the actual manufacturing process. So the claims are directed to, as Your Honor referred to— Now I think we're quibbling about language. There's making the compound, putting the epiprostanol—is it epo or epo? We've been saying epiprostanol. Epiprostanol, okay. With the arginine and the other elements, and then you've got your solution. And then eventually, to get to the powder, you have a freeze-dry process. I took it that your submission was it's the—do you call it the compounding? The putting together of the three liquids into—to make the solution before you do the freeze-dry. So for purposes of the facts of this case, it doesn't matter because the compounding, the filtering, and the lyophilization— the compounding and filtering, it's undisputed. They take place at cool temperature, and the lyophilization can take a place immediately after that. But as to Your Honor's specific question— Under the patent or in— In the ANDA, Your Honor. In the ANDA. And so as to the patent, though, Your Honor, the claims are directed to the composition of the bulk solution itself during the manufacturing process. And as the examiner stated— Can you avoid using the phrase during the manufacturing process? Because I think, as we just discussed, that covers at least two different things. Sure. I'll focus then on the examiner's language. The examiner pointed out that it's the composition of the bulk solution as made. Those were the exact words of the examiner that imparts the critical function. Can you remind me, was that as-made pair of words referring to the composition or to the solution? The bulk solution, Your Honor. The same words that are in the claim. So the claim— What's the page in the appendix on that? So this is Appendix 6338. Actually, I apologize, Your Honor. It's also at Appendix 4012. And the exact language, just to be clear, is pH of the bulk solution when made. When made. Correct, Your Honor. Yes. And the reason for that—and this was actually one of the things the parties on the court agreed on at this court level— is that it actually—keeping the pH at that level directly reduces the hydrogen ion concentration. And it's a scientific fact agreed by the parties that for the particular molecule at issue, the presence of the hydrogen actually catalyzes a degradation process. So I think going back to Judge Chanto's question, I understand your position to be that you don't need to worry about the temperature in the claim. It should be—whatever the temperature is, it's going to be when made, right? When made. That's right. We do worry about it, but it's when made. I want to go back to Judge Chanto's question, which is that he says, well, when made, or in the claim language, when formed, could be a long process. So which temperature is it? What time is it during that process? So you could have some theoretical set of facts where you'd have a complicated factual dispute or even another claim construction dispute over— But then under the specification, what's your view? I'm forgetting about accused products right now, because we're just supposed to look at the intrinsic evidence, right, really, and some extrinsic evidence about the meaning of pH and whatnot. But I don't want to talk about accused products just yet. Yeah, the specification itself is more straightforward. It simply talks about a bulk solution. A bulk solution is necessarily going to have a temperature. There's no contemplation in the specification that we're going to be talking about having, you know, some kind of spikes or some sort of long, complicated process. You're simply compounding a solution, and then you are filtering it and lyophilizing it. So that situation— Do you agree—do you think there's an example in the specification when the manufacturing process that is the lyophilizing occurs at 5 degrees Celsius? Are you reading that correctly? The specification is open-ended as to what process someone might choose to use, whether they use a cool temperature, they use a room temperature. Otherwise, the examples in the specification, other than— Can I ask you about a specific example? Would that be okay? I'm sorry to interrupt you. Sure. I want to make sure that we used your time. I got specific questions. So on page A99, column 10, lines 48 to 50, it says something about it's conceivable to manufacture this formulation in a parenteral facility without cooling the bulk solution to 5 degrees Celsius. Does that suggest that there's embodiments where you are cooling it to 5 degrees Celsius during the lyophilization? You mean prior to the lyophilization, during creation of—  Right. So, yeah, that's an acknowledgment in the specification. It's well known in the art that you can create the bulk solution at cool temperature, or you could create it at room temperature. Either of those is permissible. The specific examples in the— How does the lyophilization occur? Lyophilization is the very last step where it turns it into sort of that white powder product that ultimately goes out to the consumer for eventual reconstitution. What's the temperature then? It doesn't— For this specification. It's frozen. Lyophilization, by definition, it's basically a freezing process. Like during the—because it's freeze-dried. During the lyophilization, so do you think when formed means during lyophilization? Sorry if I'm butchering the word. So when formed would be you have the bulk solution, and then you're putting the bulk solution into the lyophilizer. And so it's the bulk solution itself is already formed at the time that it goes into the lyophilizer. The lyophilizer is just the very final step to turn it into the freeze-dried end product. Just to be clear about the language, the claims don't say when formed. That's correct, Your Honor. Lyophilization is formed— From a bulk solution. Yes, Your Honor. And if there's a big gap in time, that pH might change, like during eight hours. But in the ANDA, there's not a big gap in time, and the specification as well does not contemplate a big gap in time. It would be in a pharmaceutical process pretty unusual, especially when the entire point of this is that we're trying to keep the hydrogen ions down because that's a known fact. The inventors discovered that that's going to create a more stable product. And so there's certainly no contemplation in the specification or in the ANDA that you're just going to end up wanting to leave this sitting out for an extended period of time. The whole idea is you don't want to have the excess hydrogen ions, and so you're going to lyophilize it as soon as reasonably possible. That's a practical reality. And as well, the ANDA contemplates that you may put it—  I mean, really, focusing on the specification, what in the specification supports what you're saying right now? The specification itself is completely flexible as to implementation as long as the implementer keeps that pH of the bulk solution at 13. That is the point of the specification. They can do that by the addition of base. They can do that by cold temperature. As the district court actually— taking a step back, one of the truly unusual things about the district court's order and this case is that before it goes off— Your argument is that the pH should be measured with base, and that that means not when it's warm. That is correct, Your Honor. The solution is never intentionally— Is there ever a situation when the bulk solution is made, when made, and it's also warmed? Not in the case of the ANDA issue here, Your Honor. Here, the bulk solution is intentionally maintained at cool temperature in order to keep the hydrogen ion concentration low. In theory, I'm not sure why somebody would want to do this, but the patent allows you to achieve the pH of 13 through any manufacturing method. So you could just add— The scope of when man can never cover the solution being warmed. If somebody was intentionally warming as part of their process, I guess in theory you could have a situation where someone has a very warm manufacturing process. They would need to offset that by some significant modifications in order to create that pH of 13. Sure, it is possible. It is possible that someone would create a pH of 13 at a warm temperature? Yes, Your Honor. In theory, that's possible. That's not what Mylan does here, though. That Mylan ANDA very, very intentionally creates a cool temperature environment specifically for the purpose of achieving the stability benefit of the invention. And as the district court actually found— This is on paragraph 29 at appendix 36. The district court actually specifically found and acknowledged this exact fact. The district court said the claims merely require bulk solution at pH of 13, and then the district court states, this high pH can be achieved through any technique to create a solution with low hydrogen ion concentration, including cold temperature. That's exactly what Mylan does. The reason we're here in this posture, where I'm speaking first, is that the district court then ultimately, later in the exact same order, reaches exactly diametrically opposed inconsistent position and says that the claimed pH of the bulk solution cannot be achieved through use of low temperature, but instead can only be achieved at 25 degrees. Now, that direct contradiction alone, Your Honors, I think requires reversal under precedent of Supreme Court as well as this court. Why do you think that that statement about how you can get a pH to a certain level is inconsistent with the idea that when you say, get the pH to a certain level, what you are talking about is getting the pH to that level when measured at standard temperature? Because that is scientifically impossible, Your Honor. If you get the pH to that level using cold temperature and then you pull out a sample and you warm that up and you measure the newly warmed sample at standard temperature, it's no longer going to have that same measurement. And the district court understood that. The district court stated elsewhere in the... I think I probably did not form my question properly. When the district court said you can get by cold temperature a solution to a pH of 13, why would that not make sense if translated into you can get by cold temperature a solution to a pH of 13 when measured at standard temperature? Because, Your Honor, that just wouldn't work. If you had something that was not 13 at standard temperature, you can achieve the pH of 13 by cooling it down. But then if you do, as the district court eventually found, and say, but we're not measuring that solution. We're not measuring the actual cold temperature solution. We're going to warm it up again. You're going to no longer have the pH of 13. And the district court, by the way, wasn't talking in scientific theoreticals. The district court was specifically talking about the claims. The district court says the asserted claims simply require that the bulk solution have a pH of 13 or higher. This high pH in the claims can be achieved through cold temperature. That's exactly what the district court found correctly in paragraph 29 of the order. And then the district court went and found exactly the opposite. Now, Your Honors, the district court... You're into your rebuttal time. You can go ahead and finish or use your time or reserve it. Let me touch just for a few seconds on the doctrine of equivalence issue as well, because it's a completely separate and independent grounds for reversal, even under the district court's conclusion. To summarize very, very briefly, there's at least three independent reversible errors here. The first is that the district court did not consider the actual equivalent put forward by Actillion, which was the use of cold temperature to maintain the identical chemical composition and identical stability benefits. The second is the district court's wholesale refusal to consider evidence in the ANDA, including express admissions. And the third is the district court's express statement that it was not considering insubstantial differences. So I'll reserve that very small amount of time I have left, Your Honors. Okay, we'll restore your rebuttal time when we get back up. Thank you so much. Counsel Midaskin? Oops, no. Thomas Wording. Yes, sir. May it please the Court. I want to level set because my friend's presentation kind of assumes away what is the gating question on literal infringement, which is at what temperature and how would a skilled artisan measure pH in the first place? And on that question, regardless of whether we frame it as claim construction or claim application, Actillion cannot evade clear error review. Just, Taranto, as you accurately pointed out, what is actually claimed is a lyophilized epiprostanol product that is formed from a bulk solution having a pH of 13 or higher. It's not the bulk solution itself. It's not a process for creating the bulk solution. And importantly, the specification pegs pH to standard ambient temperature by defining alkalinity as anything with a pH above 7. What the intrinsic record does not say is anything about calculating hydrogen ion concentration of the bulk solution at its production temperature. To make that theory work... Does it say expressly that you're calculating pH at ambient temperature? What it says, and this is appendix page 96, column 4, lines, let's call it 60 to 65. It's a definition of alkalinizing agent. An alkalinizing agent, as used herein, means an agent that provides an alkaline environment parenthetical pH of greater than 7. So in the process of defining what an alkalinizing agent is, it defines the alkaline environment. And both experts agreed, and the district court credited, that that is only true at standard ambient temperature. So to make its theory work, Actillion needed extrinsic evidence. It had to bring up an expert to explain how a skilled artisan would read their preferred theory into otherwise plain claim language. Actillion made its case to the district court, and it lost. Judge Bailey issued a 65-page decision... Can we get back to the claim construction rather than what I view as sort of... Sure. Sure, let's get... It's really completely irrelevant. So what do you think the language of the claim about composition formed from something having pH... Is there a temporal element to the word having? I think it is undefined. The problem... The issue that we have with this claim language is that it does not define timing. It does not define temperature. It just says formed from. It's very nebulous, and I think in that respect... There are two things that I guess are sticking in my mind from what your friend was focusing on, on the other side. One is the examiner's statement about pH when made. Second... This is probably in reverse order, but the... I'm sorry, now I'm not remembering the second thing. That's fine, and let me pull it kind of at a high level and then go to that examiner's comment. The district court's statement about you can get super high pH by freezing. Sure, so let's address paragraph 29 first because I do think that's an important point. It pervades my friend's argument, and it's not an inconsistent statement. I think, as you pointed out, all the district court said was that there is not a prescribed method for achieving, for creating the bulk solution. That's because the bulk solution itself is not clean. You can use whatever you want, high temperature, low temperature. I thought the statement was you can get to a very, very high pH by sufficiently lowering the temperature. Sure. Tell me how that makes sense on your view that when the word, the expression pH is used, unless it says otherwise, and nothing does say otherwise, it means measure it at a particular temperature, which can involve altering the current solution you have in front of you by warming it up. I think the answer to that question is that the pH measurement has to be consistent. You have to have a single standardized temperature at which you are measuring the pH because pH is temperature specific. Does this patent specification disclose measuring the pH of anything always at ambient temperature? It is silent. It doesn't define a temperature at all. What about table, I'm disagreeing with you here. Okay. Because I realize it might not be the bulk solution, but there is something. Am I misunderstanding the heading on table six and table seven where it says at a certain temperature, pH 13, pH 13 at a certain temperature, one's 29 degrees, one's one to five, plus or minus one degree. Isn't that, I mean, I recognize it's not the bulk solution. I don't think it's measuring the pH of the bulk solution, but I think it's measuring pH at two different temperatures. Well, I think what's going on is that it's the pH from which the lyophilized product was made. So this goes back to the temporal question. My question was, regardless of whether it's measuring the pH up, isn't this showing the measuring of pH or something at two different temperatures? So it's not measuring. It's all in column 10. Sure. So that's not the temperature at which pH is measured. That's the pH at which stability is determined. That's the temperature at which you are keeping the reconstituted liquid to preserve it for being able to administer. Correct. What all of these tables are doing is they are... Has anybody suggested that the P8 at those little temperatures, the five plus or minus one, the 29 plus or minus one, is the temperature for measuring pH? No.  And, in fact, both experts agreed, with the exception of example two, and I'll come back to that. But for examples one, three through six, the experts agreed that pH was measured at USP standard temperature, and the temperature measurements that you are seeing there are for the stability testing. And this all comes back to example one, where the inventors are setting the baseline for measuring stability against the prior art flow lawn composition. And that stability testing was done at five degrees Celsius. So in order to have an apples-to-apples comparison between flow lawn and the new epiprostanol composition, you had to do that stability testing at five degrees Celsius. And then, of course, there was testing at additional temperatures to see how the new compositions would react. But... And when you say at... This is, again, you make the bulk solution. At some period, you freeze-dried it, and you get a powder. Later, you have the little powder in a vial. You add some kind of...  And now you have something that is ready to be given to somebody intravenously. And the question is, how long will that last in a decent form, either in the refrigerator or in room temperature? And the five and the 29 are about the temperature of the vial with the liquid of the reconstituted freeze-dried, the reconstituted powder. Is that right? That is right.  That is right. So I want to address one comment that... Can I ask you another question? Please, please. Okay. Column 3, line 47 refers to a pH of 9.3 at 23 degrees Celsius. Yes. How do you treat that? So I think the reason it is defining a different temperature... And I apologize. I think the reason it is defining a temperature there is because it is not at USP ambient, standard ambient temperature. So what it shows is that when the drafters of this patent intended for pH to be measured at something other than USP, they defined it. So that is why you have this here. So can... I guess I remain focused on paragraph 29.  And that statement by the examiner that uses the phrase when made with reference to the bulk solution, not with reference to the composition. So let me come back to paragraph 29. Have I answered your questions on paragraph 29? I don't think I would be asking if you had. Okay. Fair point. So what I think is important about paragraph 29 is that because there is not a process that is defined for making the bulk solution, we have to have a standard for measuring the temperature so that there can be an apples-to-apples comparison, so that the public can be on notice of what is claimed and what is not. And that is what we went to trial over. Is that standard USP or is it operating temperature? Can I ask you hypothetically? Please. If the claim did and you agreed that it said something like the pH of 13 when formed or when, a very specific time that everybody could agree upon, then you would agree that it would be specific enough because you would just know what the temperature is at that time. Yes, I think there is a way. Hypothetically, there is a way that Actillion could have drafted this patent to where if they wanted to capture the pH during the compounding process, they could have done that, but they didn't. They just said a lyophilized product formed from a bulk solution at a pH of 13 or higher. And coming back to your point, what that is claiming is what is the pH of the bulk solution when you put it in the lyophilizer and you push start. And in order to flatten out the variables that you can have with timing, with temperature, with things of that nature that might affect the pH reading, that's where USP comes in because USP flattens all of that out. And this is even though what to a layperson sounds odd, that if you're talking about the pH of this refrigerated solution somewhere around 5 or something, 2 to 8, whatever, basically refrigerator temperature, that when you say that has a pH of N, that in your view, what you're talking about is taking the solution that exists in a particular state at that moment and changing it by warming it up and then sticking the pH measure in pipette. Right. You take a sample. Is that odd? No, I don't think it's odd. I think it's science. And I think the reason why is precise, coming back to paragraph 29, is because you can use cold manufacturing, you can use ambient temperature manufacturing. The pH measurements that you're going to get through those processes are not going to be comparable because of the effect that temperature has on pH. And the whole point of USP-791 is that we set, when you're in a laboratory environment, which we are, you set a standardized temperature, you take a sample, and then you sample at a set temperature. And one of the big reasons why you do that is because even when you're calibrating your pH meter, you have to take temperature into account. So I think it is the very fact that you can use any process to make this bulk solution is exactly why USP makes sense. Do we need to go back to the question about paragraph 29? That was paragraph 29. I welcome any additional questions on that. I wanted to get to the examiner's comment. Oh, I'm sorry, did you... No, go ahead. Examiner's reasons for allowance. Sure, yes, and this is appendix page 422. I think there's a bit of a misunderstanding of that, and I want to quote the language. This is appendix page 4222, reasons for allowance. And what is going on here is that the examiner is talking about the lyophilized composition. Is this identical, I'm sorry, to the reasons for allowance at 4012? At 4012? I would have to check. I mean, if they're identical... I think they're at 4012. Oh, is it? Oh, I think this is what they call the corrected notice of allowance. Okay, so then I grabbed the wrong page out of my binder. Composition. Right, so I think this is confusion as to what composition we're talking about. And I think if you read the very first line, it's clear we're talking about the lyophilized. Locate me, please. What page, where? Appendix page 4012. 4012? 4012. And I am looking at the first line that is under the following is an examiner's statement for reasons of allowance. Applicant has amended the claims to require a composition made from a bulk solution with a pH of 13 or higher. So when the examiner is speaking of the composition, we're speaking of the lyophilized composition. Right, but it's like four sentences later that I think is the when made phrase appears. Is that right? The claims are drawn to product by process. However, with the unexpected results, applicant has established that the pH of the bulk solution when made imparts a critical function, blah, blah, blah. Right, and the way I read that is the when made is speaking of the composition itself, because that is ultimately what is claimed.  Correct, the lyophilized product, because that is what is claimed. The bulk solution is not claimed. There's not a process for claiming a bulk solution. It is the lyophilized product. So with my 10 seconds, I want to... Can I ask you then, so if the... Please, no, please, I am here to answer questions, please. If the lyophilized product occurred at 5 degrees Celsius, I mean, and that's at the pH was 13 at that temperature, would that then meet the claim? So if you are lyophilizing a bulk solution that is at 5 degrees, and at 5 degrees, it has a pH of 13. If you accept the district court's holding that pH needs to be measured at USP, no. Because you'd have to warm up the bulk solution, measure it. Correct. If you're accepting the operating temperature theory, I guess perhaps, but I do want to point out, I want to correct one misstatement that my friend made about what is within the scope of Myelin's ANDA. You can't just take the bulk solution and throw it into the lyophilizer. There are multiple steps in between the compounding and lyophilization that occur, and they do not occur at a cold temperature. If hypothetically we were to disagree with your claim construction, I don't see how we could resolve that anyway, right? Resolve the... Like you're talking about the differences between the ANDA and what's in the claim, and it sounds like you're making a non-infringement argument. Correct. Even if you agreed with the construction being proper by the appellant. And that's not something we would address, right? Well, the district court made that holding, and I think you would affirm it under clear error, because what the district court said is that even if I credit Actillion's argument, there's still a failure-proof problem because the only evidence you offered was the operating temperature of the bulk solution when it is sitting in the compounding vessel. And back to your point, that's not what's claimed. There is this legal question, let's call it the synovian question. The synovian question, yes. I'm not sure you... Have you dealt with that particularly? Right, the synovian question being the ANDA seems to permit going pretty directly, maybe there's a few steps, I don't know, up to eight hours, which does not seem to require letting things warm up. And I think the argument is that means that using the still very cold solution to put it into the freeze-drying process is covered by the ANDA, and that's a problem. So to address the synovian problem, I think this is where you come back to the failure-of-proof issue. It is not apparent on the face of the ANDA how long this process takes. They could have offered evidence on that, but they didn't. They instead focused myopically on the composition. So you're relying on the series of cases that say sometimes the ANDA is clear, sometimes it's uncertain, and when it's uncertain, you can look at other evidence. Right, because we did everything under USP. So there's nothing in there that speaks to the timing between those processes other than setting a ceiling, and certainly nothing that talks about the hydrogen ion concentration of the solution right when it goes into the lyophilizer, because under our process, that doesn't matter. If Actillion thought that there was an infringing scenario based upon its theory, it needed to come forward with that evidence, and it didn't do it. So even if you disagree with the claim construction, I still think you can affirm. Thank you. Thank you so much, Your Honors. I'll start on the last point regarding synovian, which is that we believe this should just be a reversal, but in the event that there's not a full reversal, the district court utterly failed to consider the synovian standard even though we had raised it. And so at the very, very minimum, there would need to be a remand for the court to actually apply the correct legal test under synovian, which it failed to do. The other point I wanted to pick up from opposing counsel was the admission by Mylan at this argument that the specification is silent as to the temperature at which the pH is measured in the claims, and that's critical. It's silent intentionally. It's silent because it doesn't matter other than the point that you need to measure the actual pH of the actual bulk solution. That's a critical part of the claims, as the district court itself did find in that one correct paragraph 29 within the order. I believe there was also a concession. I might be slightly misquoting. I could have written it down a little bit wrong, but what matters is the pH when you put it in the lyophilizer, and that is absolutely inconsistent with the district court's holding, as well as what Mylan's position was in the district court. If what matters is when we put it in the lyophilizer, we have both the ANDA, which shows it can be put in immediately from the refrigerated state, and we have, as Judge Stoll pointed out, the fact that the lyophilizer is also at the cold temperature, and this is... The lyophilizer, to understand the process, is first you freeze it, and then you really freeze it, like to under 25, minus 25 degrees Celsius, which takes a while, hours. I think the spec describes this, right? And then you have a whole bunch of ice, and you suck a lot of the ice out, and then there might be a little bit more moisture. At that point, you warm it up, back up to 20 or 25 or something degrees positive. Is that right? I don't think there's a warming phase, at least not on this record, but I do believe everything else you said sounded roughly correct to me. It goes in... You want to evaporate whatever moisture is left. There's a big temperature swing in the full process. The part that is in the record here, I believe, is that there's an optional pre-cooling at 10 degrees for if it has gotten warmer than 10 degrees, which is, my Lincoln 10's not applicable here, presumably because it doesn't get colder than 10 degrees, and then your Honor is absolutely correct that it becomes very, very, very cold during the freeze-drying process, and I believe that that is all that there is on the current record here. I also wanted to pick up on the question Your Honor, Judge Toronto had asked whether it was odd to talk about warming it up, and the response was, well, it's just science. And to be completely clear, it is odd, and it's certainly not science. Every single piece of extrinsic evidence in the record that directly engaged the question of whether you would be measuring at actual temperature or whether you would be warming it up specifically answered it to say that you would not be warming it up. And to be very explicit, for example, at Appendix 6021, the Dean reference, which the District Court refused to consider, even though this Court previously on remand had said you need to look at the textbooks and treatises, specifically states solutions should be measured at their operating temperatures and not cooled to room temperature. In that instance, it was talking about cooling. We have also the ASTM standard, which says the true pH of an aqueous solution is affected by temperature. Numerous other references, the Macmillan Appendix 5986, Christian 5950, all talking about the fact that any meaningful actual pH measurement needs to be at actual temperature. So unless Your Honors have further questions... Thank you. Thank you so much, Your Honors. Thank the parties for their argument. We'll take the case under solution.